Fred M. Blum (SBN 101586)
fblum@eghblaw.com
Lisa M. Stevenson (SBN 228338)
lstevenson@eghblaw.com
EDLIN, GALLAGHER, HUIE & BLUM
515 S. Flower Street, Suite 10120
Los Angeles, CA 90071
Telephone: (415) 397-9006
Fax: (415) 397-1339

Stuart I. Friedman (Pro Hac Vice Granted)
sfriedman@friedmanwittenstein.com
Ivan O. Kline (Pro Hac Vice Granted)
ikline@friedmanwittenstein.com
Jonathan D. Daugherty (Pro Hac Vice to be submitted)
jdaugherty@friedmanwittenstein.com
FRIEDMAN & WITTENSTEIN
A Professional Corporation
1345 Avenue of the Americas, 2nd Floor
New York, New York 10105
Telephone: (212) 750-8700

Attorneys for Plaintiff
JANUS ET CIE

# IN THE UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JANUS ET CIE,<br><br>                    Plaintiff,<br><br>    vs.<br><br>JANICE FELDMAN,<br><br>                    Defendant. | Case No.: 2:23-cv-6000-PA (ASx)<br><br>**FIRST AMENDED COMPLAINT FOR:**<br>1. **BREACH OF CONTRACT/ BREACH OF REPRESENTATION AND WARRANTY**<br>2. **BREACH OF CONTRACT/GOOD FAITH AND FAIR DEALING**<br>3. **CA PENAL CODE 496**<br>4. **DECLARATORY JUDGMENT**<br><br>JURY TRIAL DEMANDED |

Plaintiff JANUS et Cie ("JEC"), by and through its attorneys, Edlin, Gallagher, Huie & Blum and Friedman & Wittenstein, A Professional Corporation, alleges as follows:

- 1 -
FIRST AMENDED COMPLAINT

## NATURE OF THE ACTION

1. JEC is a seller of design-driven furnishings for the outdoors, with its principal place of business in Santa Fe Springs, California. On May 2, 2016, a controlling interest in JEC was purchased by Haworth, Inc. ("Haworth"), a manufacturer of office furniture systems and related products, and JEC became part of Haworth's Lifestyle Design family of companies, which includes the Poltrana Frau Group companies ("PFG"). On July 1, 2019, Haworth purchased the remaining interest in JEC and thereafter owned 100 percent of the company.

2. Prior to its purchase by Haworth, JEC was wholly owned by defendant Janice Feldman ("Feldman"), through a trust for which she was the sole trustee. After the initial transaction, Feldman remained employed by JEC as its CEO, with duties that remained essentially unchanged and included control and oversight of all aspects of the business. In the period between May 2, 2016, and July 1, 2019, Feldman, through her trust, retained ownership of 20% of JEC.

3. Feldman also provided services, in addition and independent of her obligations as the CEO, pursuant to a written design agreement with JEC (as Amended and Restated as of August 31, 2016, the "Design Agreement"). A copy of the Design Agreement is attached hereto as Exhibit A. Under the Design Agreement, if Feldman – apart from her duties as CEO – created certain designs that needed to be subsequently approved, she would be entitled to a royalty on sales of the products that were based on such designs. Pursuant to the Design Agreement, royalties were limited exclusively to products that were based on designs that she created after the date of Haworth's acquisition of JEC on May 2, 2016, and for which Feldman was the **sole creator of the design**.

4. Since Feldman ceased being CEO and left JEC on December 31, 2020, JEC has discovered that Feldman submitted manifestly non-qualifying designs for approval and improperly received royalties on sales of products based on such designs. These improperly compensated designs (a) were completed or substantially completed

– and in some cases already in production – prior to the date of the acquisition of JEC by Haworth; (b) were not created "solely" by herself, but rather for which she collaborated with JEC's design staff or others to create the design; and/or (c) were actually created – and, in some cases, are currently owned – by Chinese or Southeast Asian furniture manufacturers from which JEC purchased the furniture, so that Feldman had no rights to them at all.

5. Prior to her leaving her employment Feldman played dual roles as CEO of JEC and as a designer claiming royalties, and thus effectively stood on both sides of these transactions, and was thus in a position to conceal her wrongdoing from JEC and did conceal her wrongdoing. Although not a breach of the Design Agreement, Feldman's role as CEO and founder of JEC enabled her to conceal her breaches of the Design Agreement from JEC. Thus, Feldman knowingly sought and received royalties on products relating to designs which she knew or should have known were not owed to her.

6. Accordingly, JEC brings this action seeking recoupment of royalty payments wrongly received by Feldman, treble damages for theft, and a declaration that certain designs are not subject to royalty payments going forward.

7. JEC is a California corporation, with its principal place of business located in Los Angeles County, California. JEC is a seller of high-end, design driven outdoor furniture, much of which is designed by JEC's own designers, including Feldman. JEC does not manufacture any of its own outdoor furniture products. Rather, all, or substantially all, of the furniture it sells is purchased from manufacturers in China and Southeast Asia.

8. Feldman is a citizen of Nevada and resides in Las Vegas, Nevada. Feldman is the founder of JEC and ran the company as its CEO until December 31, 2020.

## JURISDICTION AND VENUE

9. Pursuant to the Design Agreement between JEC and Feldman, both parties have consented to the personal jurisdiction of this Court.

10. This Court has subject matter jurisdiction over this civil action under 28 U.S.C. § 1332(a)(1), as the parties are citizens of different states and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and the Court may declare the rights and other legal relations of the parties under 28 U.S.C. § 2201.

11. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2), as a substantial part of the events or omissions giving rise to the claim occurred in this district, and pursuant to the agreement of the parties in the Design Agreement.

## FACTS

### The 2016 Transaction and Feldman's Continued Employment as CEO

12. On May 2, 2016, pursuant to a Stock Purchase Agreement dated April 11, 2016, Haworth acquired 80% ownership of JEC from Feldman's trust for approximately $84.5 million. In 2019, following the exercise of a "put option" by Feldman's trust, Haworth paid Feldman's trust an additional $33 million for the remaining 20% of JEC. In total, Haworth paid Feldman, through her trust, approximately $117.5 million for all of the stock of JEC.

13. Following the initial transaction on May 2, 2016, and subject to the 20% interest in JEC temporarily retained by Feldman until July 1, 2019, Feldman had no ownership interest in any capacity in existing designs, whether developed or in development, of JEC. JEC owned or controlled all of the property, good will, intellectual property and rights to relationships with designers, manufacturers and other third-parties doing business with JEC.

14. On May 2, 2016 (the date when the sale of 80% of JEC to Haworth closed), Feldman also entered into a written employment agreement (the "Employment

Agreement") with JEC, pursuant to which Feldman was employed as the Chief Executive Officer ("CEO") of JEC. The Employment Agreement was subsequently revised and restated on July 1, 2019 (the "Amended Employment Agreement"), contemporaneously with the exercise of the "put option" referenced in Paragraph 12, *supra*. As CEO, Feldman, in addition to her other responsibilities, continued to select new products from vendors and manufacturers.

15. As compensation for her employment, Feldman received an initial salary of $490,000 in 2016. Feldman's salary remained the same until 2020, Feldman's final year, during which she was paid $980,000 as CEO of JEC pursuant to the Amended Employment Agreement.

16. Both before and after its restatement, Section 4.04 of the Employment Agreement and Amended Employment Agreement, as well as the laws of the State of California, provided that all intellectual property conceived of by Feldman in the course of her employment was owned by JEC. In addition, Section 4.04 confirmed that there was no intellectual property – including industrial designs – for which Feldman had any ownership interest as of the date it was entered into, May 2, 2016.

17. Feldman's employment with JEC ended on December 31, 2020.

### The Design Agreement

18. Effective the same day as the Employment Agreement (May 2, 2016), Feldman and JEC entered into a Design Agreement, which was later Amended and Restated on August 31, 2016. The parties to the Design Agreement were Feldman, JEC and PFG.

19. The purpose of the Design Agreement was to compensate Feldman for services separate and apart from those as the CEO, but only if she designed products sold by JEC that satisfied certain specific requirements. Pursuant to the Design Agreement, as it pertains to the issues relevant herein, Feldman was to receive compensation for product designs after May 2, 2016 that were acceptable to JEC and

"created solely" by her. Such compensation under the Design Agreement was separate and independent from the Employment Agreement, and Feldman's services under the Design Agreement were explicitly not furnished as an employee of JEC, but rather as an "independent contractor" (Design Agreement § 11)..

20. Specifically, the Design Agreement contemplated that Feldman could create three categories of designs for which she would be separately compensated: 1) Original Designs, meaning "original Designs created by [Feldman] from [May 2, 2016] and intended for Products to be manufactured, marketed, and distributed by" JEC; 2) Conversion Designs, meaning "upon request of the CEO of Poltrana Frau Group Designs intended for Products based on existing products, product designs or concepts . . . owned by, or licensed to Poltrana Frau Group's affiliates . . . that can be converted or manufactured for outdoor use"; and 3) Derivative Designs, meaning "Designs based solely upon Accepted [Original] Designs and Conversion Designs." (Design Agreement § 1). The compensation structure of the Design Agreement only compensated Feldman for designs solely created by her after May 2, 2016, since, as part of the sale of JEC, Feldman had renounced any rights to ownership in any designs created prior to that date and as an employee of Plaintiff she had no right to be compensated for designs developed as part of her employment.

21. Feldman was to be paid a royalty of 4% in perpetuity on product sales based on Original Designs, and 2% on product sales for ten years based on Conversion Designs. Royalties for Derivative Designs were paid based on whether the design was derivative of an Original Design or a Conversion Design. (Design Agreement § 5(a)). In other words, if a Derivative Design stemmed from an Original Design product sale, it entitled Feldman to a 4% royalty in perpetuity; and, if the Derivative Design stemmed from a Conversion Design product sale, it resulted in a 2% royalty for 10 years.

22. As set forth above, Feldman's designs were to be created independent of her employment with JEC. Further, Feldman represented and warranted, among other things, that "Original Designs to be provided by [Feldman] are **original creations and**

**created solely by [Feldman], and no third parties (including no other designers) will have contributed to the creation of such Original Designs**." (Design Agreement § 9(ii)). (Emphasis supplied.)

23. Feldman also represented and warranted that she was not taking others' intellectual property in making Original Designs. Specifically, Feldman represented in the Design Agreement that "the Original Designs, to your knowledge, at the time of creation will not violate any intellectual property right of any third party, including copyright, patent, trade dress, trade secret or industrial design." (Design Agreement § 9(iii)). Accordingly, to qualify as an Original Design, the design had to be created after May 2, 2016 "solely" by Feldman without the collaboration or contribution of other designers at JEC or external of JEC, including designers of the Chinese and Southeast Asian manufacturers from which JEC purchases all of its product.

24. Under the Design Agreement, Feldman was required to submit her putative designs to PFG for approval prior to their development into products. PFG made the determination whether the design was commercially and aesthetically appropriate for JEC's product line and the PFG family of companies but did not do an investigation of whether a particular design was or was not created "solely" by Feldman, owned by a third party, or pre-dated May 2, 2016. Rather, under the terms of the Design Agreement, those requirements were expressly warranted and represented to be true by Feldman, and PFG and JEC relied on her veracity in that respect.

25. Following the signing of the Design Agreement, from the outset of the calculation of royalties owing to her, Feldman—the CEO of JEC—began to dispute the sufficiency of the royalty payments by JEC and aggressively campaigned for the payment of more and more royalties to her. After her separation from JEC, Feldman's requests for more and more royalty payments increased.

26. Feldman, both during and after her employment with JEC, in an effort to increase the amount of royalties she was receiving, provided, or caused her present or

past subordinates (at JEC to provide, a list of all products sold by JEC for which she asserted a royalty was due her. Feldman, in violation of the terms of the Design Agreement, included products for which she did not believe and had no reason to believe she was entitled to receive royalties. Feldman improperly obtained royalty payments based on designs that were plainly outside the scope of compensable designs under the Design Agreement.

### Pre-Purchase Designs

27.  The Design Agreement only provides for royalties to be paid on products designed after the May 2, 2016 acquisition of JEC by Haworth, and expressly excludes designs that predated May 2, 2016 from eligibility for royalty payments. (Design Agreement § 1; see also Employment Agreement and Amended Employment Agreement § 4.04.)

28.  Feldman, while CEO of JEC, knew that certain designs predated May 2, 2016, and she also knew that under the Design Agreement JEC was only to pay her royalties on designs created by her after the date of the original Design Agreement (May 2, 2016); nonetheless Feldman wrongfully, both during and after her employment with JEC, submitted, requested payment, and was paid royalties on all these products.

29.  In addition, in at least some instances, Feldman specifically instructed employees of JEC to include pre-May 2, 2016 designs for royalty payments. As a result, Feldman caused royalties to be wrongly paid to her on post-May 2, 2016 sales even though the designs of such products pre-dated May 2, 2016.

30.  At all relevant times, Feldman knew that she had renounced any ownership interest in designs pre-dating May 2, 2016, and that she could not be owed royalties on such designs.

31.  Feldman nonetheless sought and was paid royalties on some products which were designed prior to May 2, 2016.

32. Feldman, based on her position as CEO, was in a unique and superior position to control the information available to justify her payment demands. Feldman, both during and after her employment, misrepresented such information in an attempt to render JEC unaware that she was wrongfully claiming royalties to which she was not entitled. Examples of this include JEC's Conic series, the Arbor Club Chair (Seashell), Niche Armchair (Bronze), and the Vino Collection. Of the many product lines for which Feldman claimed and was paid royalties, Plaintiff has identified, at the time of the filing of this Complaint, more than 200 that existed prior to May 2, 2016.

33. Notwithstanding her knowledge that she did not own designs pre-dating May 2, 2016, Feldman instructed JEC's CFO to pay royalties on pre-May 2, 2016 designs anyway, and royalties were in fact paid on these designs.

34. In April of 2022, after her employment ceased, Feldman sent a demand letter to JEC demanding additional royalty payments which she had no basis to receive.

### Designs Not Created Solely by Feldman

35. In addition to the requirement that royalty producing designs post-date May 2, 2016, pursuant to the Design Agreement Feldman is only entitled to a royalty payment when she is the "sole[]" designer. Feldman breached her warranty in this regard in many instances, and in varying manners.

36. In the majority of cases Feldman used other designers employed by JEC or independent of JEC to contribute to and co-create her putative designs. In some cases, she would sketch out a design and have another designer at JEC fill in or supplement design features in order to complete the design.

37. In most cases, Feldman would give a JEC designer a very rudimentary sketch or merely a concept, sometimes referred to as a "doodle", and that designer would actually design the product around or based on that doodle or concept. In such instances, while Feldman may have contributed to the design, she was not the "sole[]"

designer. Because other designers at JEC contributed to the creation of the design, such designs do not satisfy the Design Agreement's requirements for royalties.

38. In some cases, JEC (both before and after Feldman sold the company to Haworth) would send employees to Chinese and Southeast Asian furniture manufacturers to view products currently on offer in such manufacturers' product catalogues or showrooms. Then JEC designers, including Feldman, would make either no changes or minor "color & finishing" changes to the product and apply JEC branding so that JEC could have an exclusive product it could distribute under the JEC name.

39. As she specifically intended, Feldman was paid royalties on products which were not created solely by her.

40. Of the designs for which Feldman was paid royalties, many were not "solely" designed by Feldman because other designers provided material contributions to Feldman's sketch or concept. Examples are the Rondo line of products, Rattan Translation Products, Koko II Alta designs, cushions as a stand-alone product and the Fibonacci line. Feldman knew, or certainly should have known, that these designs, and others, were not solely created by her at the time that she requested royalty payments for them.

### Feldman Was in a Superior Position from JEC to Recognize Her Wrongful Course of Conduct, and Actively Prevented JEC from Detecting Her Breaches and JEC's Injuries

41. Feldman, who was the founder and principal historic designer of JEC and its then-current CEO, was in a vastly superior position than either others at JEC or certainly Haworth, as the new majority stockholder of JEC, or PFG, a new affiliate of JEC, to know that many of the designs she submitted did not qualify as such under the Design Agreement, and that the royalty payments she received should not have been paid to her.

42. Feldman used this superior knowledge to submit both designs and requests for payment of design royalties on products that she knew to be outside the scope of the Design Agreement with the expectation that her misrepresentations could not and would not be detected, challenged, or discovered by others at JEC or PFG.

43. By not sharing her superior knowledge, including her historical knowledge of designs created prior to May 2, 2016, designs created in collaboration with other JEC designers, designs originated by customers as "custom" products, and designs created and even owned by Chinese and Southeast Asian manufacturers, and by misrepresenting the true design histories of various products, Feldman actively sought to prevent JEC, Haworth (JEC's owner) and PFG (JEC's affiliate) from discovering her wrongdoing.

44. Because of Feldman's misrepresentations and failure to share her superior knowledge of the design histories of various products, neither JEC nor PFG determined that Feldman was submitting designs in violation of the Design Agreement's representations and warranties.

45. Further, because Feldman was the CEO of JEC, a 20% shareholder of JEC until 2019, and had expressly warranted and represented that the so-called "Original Designs" submitted by her for royalty payments were "created solely" by her, JEC did not question her conduct or veracity.

46. Only after Feldman left JEC, did JEC eventually discover the fact and extent of Feldman's wrongful conduct. Thus, Haworth in conjunction with JEC's new CEO, its CFO and its Vice President of Product Development and Design conducted a systematic review and audit during the year and a half following Feldman's departure from the company. By comparing the results of product offering dates, auditing vendor relationships, and reviewing the sales history of products based on Designs that resulted in royalty payments under the Design Agreement, JEC, PFG, and Haworth came to understand and discover Feldman's wrongful conduct.

**Feldman's Continuing Breaches and Harms**

47. Feldman continues to cause harm to JEC by continuing to claim royalty payments to which she is not entitled. Specifically, over the years and up to the present, each and every time Feldman submitted a putative "Original Design" for approval that pre-dated May 2, 2016, was not "created solely" by her, or both; each time she requested payments of royalties on sales of such unqualified products; and each time she accepted payments of royalties on sales of such unqualified products, Feldman breached the Design Agreement, and violated her express representations and warranties therein, in order to improperly obtain royalties she was not entitled to receive.

48. Feldman made demands or requested payments of royalties on sales of such unqualified products before the termination of her employment on December 31, 2020.

49. Feldman has also made demands or requested payments of royalties on sales of such unqualified products since the termination of her employment on December 31, 2020.

50. By way of illustration, and not limitation, Feldman has demanded royalty payments on April 29, 2022, May 11, 2022, June 17, 2022, and August 12, 2022. Feldman's demand on April 29, 2022, requested royalty payments "covering the period of time from 2016 to the present."

51. Feldman summarized in her April 29, 2022 demand other demands for payment that she had previously made on November 18, 2018, March 4, 2019, March 19, 2019, March 26, 2019, July 10, 2019, December 11, 2019, December 27, 2020, February 17, 2021, August 4, 2021, August 22, 2021, October 12, 2021, and December 14, 2021.

52. Feldman was paid royalties on sales of unqualified products both before and after the termination of her employment in excess of $75,000. In addition, she has

claimed entitlement to future payments of royalties on sales of unqualified products in excess of $1 million per year in perpetuity.

# FIRST CLAIM FOR RELIEF

## (Breach of The Design Agreement,

## Including Breach of Warranty and Representation)

53. Plaintiff incorporates by reference the allegations contained in all preceding paragraphs of this Complaint.

54. The Design Agreement is a valid and enforceable contract.

55. JEC has performed all of its obligations under the Design Agreement except those that it is excused from performing as a result of the conduct of Feldman.

56. During the period from May 2, 2016 through December 31, 2020, Feldman, by acting in the manner described above, breached the Design Agreement.

57. In order to hide her breaches of the Design Agreement, Feldman used her position as CEO of JEC, and her superior knowledge of the designs that she had submitted and requested payment on, in order to prevent JEC from discovering Feldman's breaches of the Design Agreement.

58. Because Feldman prevented it from doing so earlier, only after Feldman's employment ended on December 31, 2020, was JEC in a position to discover her breaches.

59. Feldman continued to breach the Design Agreement after December 31, 2020 when her employment had entirely terminated in the manner described above.

60. On August 9, 2022, the parties executed a tolling agreement, which was subsequently amended and restated on December 19, 2022. Pursuant to the Amended and Restated Tolling Agreement, the tolling period was not to be included "in computing any statute of limitations … or any contractual limitations period in the Design Agreement… or any other time-based doctrine or defense…".

61. The tolling period ran from August 9, 2022, until the date that the Complaint was filed in this Action.

62. During the period from May 2, 2016 through the present, Feldman has regularly and improperly demanded and been paid royalties which she had no right to receive.

63. As a direct and proximate result of Feldman's breaches, Plaintiff has been damaged in an amount which Plaintiff calculates currently exceeds approximately $1.9 million.

## SECOND CLAIM FOR RELIEF

**(Breach of Contract – Duty of Good Faith and Fair Dealing)**

64. Plaintiff incorporates by reference the allegations contained in all preceding paragraphs of this Complaint.

65. Feldman was obligated to exercise her rights under the Design Agreement, including with respect to the submission of Designs for approval or payment, in good faith and by dealing fairly with JEC.

66. Feldman breached her duty of good faith and fair dealing and her superior knowledge by, among other things, causing JEC to pay royalties on Designs which were outside the scope of the Design Agreement, and for which she had no entitlement to royalties.

67. Feldman's conduct was designed solely to further her own interests and was undertaken in total disregard of the rights and interests of JEC.

68. By virtue of the above, JEC is entitled to recover damages against Feldman for all amounts she wrongfully received with respect to Designs outside the scope of the Design Agreement.

# THIRD CLAIM FOR RELIEF

## (For Violation of Penal Code § 496; Treble Damages)

69. Plaintiff incorporates by reference the allegations contained in all preceding paragraphs of this Complaint.

70. Where one, through mistake or fraud receives money to which she or he is not entitled, she or he becomes the trustee of that money for the benefit of the one justly entitled to it. (Cal. Civ. Code § 2224). In the course of, and by virtue of the above-averred acts, Feldman received and/or fraudulently converted and used royalty payments from Plaintiff which had not been owed to her and converted said sums to her own use and exclusive benefit.

71. Such acts were taken with the intent to deprive Plaintiff of its use of said funds.

72. As described above, Feldman knowingly and designedly made false statements and pretenses, and committed material omissions claiming royalties on products that she knew were outside the scope of the Design Agreement.

73. One who knowingly and designedly, by false or fraudulent representations or pretenses, defrauds another of money is also guilty of theft. (Cal. Pen. Code § 484).

74. Feldman's actions as described above constitute violations of Penal Code Section 496. As a result of Feldman's violation of Penal Code Section 496, Plaintiff is entitled to an award of treble damages, costs of suit, and reasonable attorney's fees. (Penal Code section 496(c).)

75. As a direct and proximate result of Feldman's violations of Penal Code Section 496, Plaintiff has been damaged by Feldman in an amount that Plaintiff currently calculates exceeds $1.9 million, trebled to in excess of $5.7 million.

## FOURTH CLAIM FOR RELIEF

### (Declaratory Judgment)

76. Plaintiff incorporates by reference the allegations contained in all preceding paragraphs of this Complaint.

77. Many designs submitted by Feldman for which she received payment were wrongfully submitted and Feldman was not entitled to be paid royalties on them under the Design Agreement. On some of these designs, Feldman claims she is entitled not only to retain royalty payments already paid, but also to be paid royalties in perpetuity (even after her death to her trust).

78. Additionally, cushions that are not structurally part of the article of furniture and are purchased (or not purchased) at the customer's option are not "designs" within the meaning of the Design Agreement.

79. Feldman asserts that she is entitled to payment of royalties on both designs wrongfully submitted, as well as on cushions, in some cases in perpetuity.

80. As a direct and proximate result of the above recited facts, Plaintiff is entitled to a declaration that Feldman is not entitled to any future royalty payments on any design wrongfully submitted or on any separately sold cushions.

**WHEREFORE**, Plaintiff demands judgment as follows:

1. An award of damages to Plaintiff in an amount to be determined at trial, including but not limited to recovery of royalties wrongfully paid to Feldman, which Plaintiff calculates currently exceeds approximately $1.9 million, together with interest thereon;

2. Treble damages pursuant to Penal Code § 496(c);

3. A declaration that Feldman is not entitled to any future royalty payments on designs for which she is not entitled to the payment of royalties under the Design Agreement;

4. Reasonable attorneys' fees to the extent allowed by law;

5. Costs of the suit herein incurred; and

6.  Awarding such other and further relief as this Court deems just and proper.

DATED: August 30, 2023

                                    */s/ Fred Blum*
                                    Fred Blum (SBN101586)
                                    **EDLIN, GALLAGHER, HUIE & BLUM**
                                    515 S. Flower Street, Suite 10120
                                    Los Angeles, CA 90071
                                    Telephone: (415) 397-9006
                                    Fax: (415) 397-1339

                                    *and*

                                    **FRIEDMAN & WITTENSTEIN**
                                    A Professional Corporation
                                    Stuart I. Friedman
                                    Ivan O. Kline
                                    Jonathan D. Daugherty
                                    1345 Avenue of the Americas
                                    2nd Floor
                                    New York, New York 10105
                                    Telephone: (212) 750-8700

# JURY TRIAL DEMANDED

Plaintiff demands a trial by jury on all issues so triable.

Dated: August 30, 2023

                */s/ Fred Blum*
                Fred Blum (SBN101586)
                Jesper I. Rasmussen (SBN121001)
                Jennifer L. Lallite (SBN230135)
                **EDLIN, GALLAGHER, HUIE & BLUM**
                515 S. Flower Street, Suite 10120
                Los Angeles, CA 90071
                Telephone: (415) 397-9006
                Fax: (415) 397-1339

                *and*

                **FRIEDMAN & WITTENSTEIN**
                A Professional Corporation
                Stuart I. Friedman
                Ivan O. Kline
                Jonathan D. Daugherty
                1345 Avenue of the Americas
                2nd Floor
                New York, New York 10105
                Telephone: (212) 750-8700

- 18 -
FIRST AMENDED COMPLAINT